Concurring Opinion by HARRELL, J.
I concur with the legal analysis of the statutory scheme and the judgment expressed in the Majority opinion. I write separately only to flesh-out the factual narrative, in the interests of posterity and fairness.
No party to this case covered itself in glory. The Majority opinion catalogs amply Petitioners’ mis-steps because it focuses as a source for the majority of its factual recitation on Stansbury’s allegations in his Third Amended Complaint, not on what was proved at trial in a case that went to the jury, and was not disposed of on preliminary motion. Moreover, although thereby including a number of immaterial “facts,” the Majority opinion neglects to mention some of the less than praiseworthy conduct of Stansbury:
• Stansbury received on or about 25 January 2011 from his insurer MAIF (after application of a $250 deductible), $6,086.00 to pay for the repair of his vehicle; he did not deposit the check into his M & T checking account until sometime in April 2011.
• He allowed those funds to be drawn-down thereafter to pay discretionary family expenses, rather than holding the money to pay Russel Collision for the repairs.
• Consequently, when Stansbury offered the first time to pay Russel Collision $6,330.37 on 18 May 2011 (after 5:00 p.m.) by check (at a point in the business day when his bank was closed), he admitted that he knew that he did not have sufficient available funds in the account (short by $3,000) to cover the check he wrote (but which a Russel employee would not accept until the bank could verify that Stansbury’s account was active).
• Stansbury’s explanation for why he wrote and tendered a check in an account that he knew lacked sufficient funds at *212 the time it was delivered was that he had $3,000-4,000 in cash at home in a safe that he intended to deposit imminently so the check would not “bounce” (the supposed $3,000-4,000 in cash in the safe was available also at the time the MAIF check proceeds were used to pay the discretionary family expenses).
• As to each of the times after 18 May 2011 that Stansbury claimed he was ready to pay ostensibly Russel Collision the original $6,330.37 repair bill, he admitted that he knew that he still had not placed additional funds in his checking account to cover such a check and that the account continued to lack sufficient funds to cover a check in that amount.
• The subsequent “bump up” of the repair costs from $6,330.37 to $6,630.37 was not a mystery to Stansbury; he acknowledged at trial that he had been told by Russel Collision that the additional $300 was for “a little extra work on the metal molding.”
Nonetheless, I agree with the Majority opinion’s interpretation of the statutory scheme. Although the statutory scheme authorizes the recovery by the lienholder of the cost and expense of having to resort to an actual sale of such a vehicle, it fails to address a “hole in the donut” where incurred or projected sale costs and expenses are demanded by the lien-holder in order for the vehicle to be redeemed prior to sale. I imagine, at least as to actual and reasonable costs paid or incurred pre-sale, it may have been a legislative oversight not to have provided for their recovery; however, as the Majority opinion concludes implicitly, it is entirely rational to refuse to authorize unreasonable, imaginary, or projected costs and expenses to be imposed as a condition of pre-sale redemption.[1] Perhaps the Legislature should re-examine the statutory scheme in light of the Court’s decision in this case.

. Russel Collision paid (pre-sale) to Allstate Lien & Recovery a total of $522 ($400 processing fee, $40 for advertising the sale, and $82 for title service). Whether that payment was reasonable is irrelevant on the record of this case.